**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELIJAH E. CUMMINGS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 17-cv-02308 (APM) |
| | ) |
| EMILY W. MURPY, Administrator, | ) |
| General Services Administration, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM OPINION**

## I.    INTRODUCTION

This case concerns an agency's refusal to produce records in response to what is referred to in political parlance as a "Seven Member Rule" request. That moniker derives from the "Seven Member Rule," which is embodied in 5 U.S.C. § 2954. Adopted by Congress in 1928, section 2954 provides in pertinent part that, upon request of the Committee on Oversight and Government Reform of the U.S. House of Representatives ("the House Oversight Committee"), "*or of any seven members thereof*," an Executive agency "shall submit any information requested of it relating to any matter within the jurisdiction of the committee." 5 U.S.C. § 2954 (emphasis added). The Seven Member Rule thus provides a statutory mechanism for members of the minority party to obtain records from the Executive Branch to support the Committee's oversight function.

Plaintiffs here are seventeen minority members of the House Oversight Committee who have made several Seven Member Rule requests of the General Services Administration ("GSA") for information relating to GSA's management of its lease agreement with Trump Old Post Office

LLC.[1]  That lease agreement granted Trump Old Post Office LLC—an entity owned by President Donald J. Trump, his daughter Ivanka Trump, and his sons, Donald, Jr., and Eric Trump—the rights to develop and convert the Old Post Office building in Washington, D.C., into the Trump International Hotel.  In early January 2017, GSA produced records that were responsive to Plaintiffs' initial requests.  Since President Trump's inauguration, however, GSA has disclosed no additional information about the Old Post Office lease agreement in direct response to Plaintiffs' subsequent Seven Member Rule requests.  Plaintiffs brought this action against GSA's Administrator to compel compliance with their Seven Member Rule requests.

Before the court is Defendant's Motion to Dismiss and Plaintiffs' Cross-Motion for Summary Judgment.  For the reasons stated below, the court concludes that these Plaintiffs, as individual members of the House Oversight Committee, lack standing to bring this action.  Thus, the court grants Defendant's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1) and denies Plaintiffs' Cross-Motion for Summary Judgment.

## II.  BACKGROUND

### A.  Statutory Background

Congress enacted the Seven Member Rule in 1928 as part of an Act containing only three sections, the first two of which are pertinent here.  *See* Act of May 29, 1928, ch. 901, 45 Stat. 986. Section 1 of the Act repealed 128 mandatory reporting statutes that obligated federal agencies to submit periodic reports to Congress.  *See id.* § 1, 45 Stat. at 986–96.  Congress repealed these requirements, because it deemed the reports to no longer "serve [a] useful purpose," as the reports proved to be labor intensive but ultimately "useless" in their utility.  *See* H.R. Rep. No. 70-1757,

---

[1] Plaintiffs are Ranking Member Elijah E. Cummings and Members Carolyn Maloney, Eleanor Holmes Norton, William Lacy Clay, Stephen Lynch, Jim Cooper, Gerald Connolly, Robin Kelly, Brenda Lawrence, Bonnie Watson Coleman, Stacey Plaskett, Val Demings, Raja Krishnamoorthi, Jamie Raskin, Peter Welch, Matt Cartwright, and Mark DeSaulnier. *See generally* Compl., ECF No. 1.

at 3, 6 (1928); *see also id.* at 6 ("The departmental labor in preparation is a waste of time and the files of Congress are cluttered up with a mass of useless reports."). Section 2 of the Act replaced this mandatory, reports-based model of disclosure with a request-driven process. *See* Act of May 29, 1928, ch. 901, § 2, 45 Stat. 986, 996. Section 2 is now codified at 5 U.S.C. § 2954, which provides in relevant part: "An Executive agency, on request of the Committee on Government Operations of the House of Representatives [today, the House Committee on Oversight and Government Reform], or of any seven members thereof . . . shall submit any information requested of it relating to any matter within the jurisdiction of the committee." 5 U.S.C. § 2954.[2] Thus, instead of requiring mandatory reporting by Executive agencies, section 2 provided a mechanism by which the House Oversight Committee and its members could obtain information by making a specific demand for information.

Section 2954 plainly gives members of the House Oversight Committee the right to request information from Executive agencies, so long as the information sought falls within the Committee's jurisdiction and at least seven members join in the request. That much is clear. Section 2954's legislative history, however, reveals some ambiguity as to the statute's reach. *See generally* Louis Fisher, *Congressional Access to Information: Using Legislative Will and Leverage*, 52 Duke L.J. 323, 362–64 (2002). Part of the legislative history suggests that Congress intended to limit the scope of a request made under section 2954 to information contained in the abolished regular reports that Executive agencies previously had sent to Congress. *See* H.R. Rep. No. 70-1757, at 6 ("To save any question as to the right of the House of Representatives to have

---

[2] A 1995 statute requires that references to the House Committee on Government Operations in earlier laws "be treated as referring to the [House] Committee on Government Reform and Oversight," References in Laws to Committees and Officers of the House of Representatives, Pub. L. No. 104-14, § 1(a)(6), 109 Stat. 186 (1995), the name of which was changed in 2007 to the Committee on Oversight and Government Reform by House resolution, *see* Pls.' Cross-Mot. for Summ. J. & Opp'n to Def.'s Mot. to Dismiss, ECF No. 11, Pls.' Mem. in Supp., ECF No. 11-1, at 1 n.1; *cf.* Def.'s Mot. to Dismiss, ECF No. 8, Def.'s Mem. of P. & A., at 1 n.1.

furnished any of the information contained in the reports proposed to be abolished, a provision has been added to the bill requiring such information. . . .").  But other portions of the legislative history suggest no such limitation.  For instance, both the House and Senate Reports provide that, "[i]f *any information* is desired by any Member or committee upon a particular subject that information can be better secured by a request made by an individual Member or committee, so framed as to bring out the special information desired."  *Id.* (emphasis added); S. Rep. No. 70-1320, at 4 (1928) (emphasis added).  Thus, hidden behind the seemingly straightforward and broad statutory language of section 2954 is legislative history that leaves some uncertainty as to the precise scope of demandable information.  *See* Fisher, *supra*, at 363.

## B.     Factual Background

Now, spring forward 85 years.  On August 5, 2013, GSA entered into a lease agreement with Trump Old Post Office LLC, a company owned by now President Donald J. Trump, his daughter Ivanka Trump, and his sons, Donald, Jr., and Eric Trump.  Compl., ECF No. 1, ¶ 10.  The lease agreement permitted the company to develop and convert the Old Post Office on Pennsylvania Avenue in Northwest Washington, D.C., into the Trump International Hotel.  *See id.*  As relevant here, Article 37.19 of the lease agreement provides:

> No member or delegate to Congress, or elected official of the Government of the United States or the Government of the District of Columbia, shall be admitted to any share or part of this Lease, or to any benefit that may arise therefrom.

*Id.* ¶ 11.  It is probably safe to say that when GSA and Trump Old Post Office LLC entered into the lease agreement in August 2013, few would have anticipated that, within years, Article 37.19 would become central to a controversy between the political branches of the federal government.

On November 8, 2016, Donald J. Trump was elected President of the United States.  On November 30, 2016, House Oversight Committee Ranking Member Elijah Cummings, joined by

4

three other Representatives, sent a letter to then GSA Administrator Denise Turner Roth requesting unredacted copies of lease documents, monthly and annual statements from Trump Post Office LLC, and a briefing. *Id*. ¶ 13. On December 14, 2016, they sent another letter to GSA requesting similar records. *See id.* ¶ 14. On December 22, 2016, Ranking Member Cummings, joined by 10 other members of the House Oversight Committee, sent a third letter to GSA that specifically invoked the Seven Member Rule and demanded unredacted documents and expense reports related to the Old Post Office lease agreement. *See id.* ¶ 15. By letter dated January 3, 2017, GSA responded to these demands and produced the requested records, including amendments to the lease, a 2017 budget estimate, and monthly income statements. *Id*. ¶ 16; *see also id.* (noting that in the letter, GSA Associate Administrator Lisa A. Austin stated that the production was "[c]onsistent with the Seven Member Rule and judicial and Department of Justice, Office of Legal Counsel opinions" (alteration in original)).

Upon his inauguration on January 20, 2017, President Trump became an "elected official of the Government of the United States." *See id.* ¶¶ 11, 18. Recall, Article 37.19 of the Old Post Office lease provides that "[n]o . . . elected official of the Government of the United States . . . shall be admitted to any share or part of this Lease, or to any benefit that may arise therefrom." *Id.* ¶ 11. Yet, according to Plaintiffs, neither President Trump nor his children have divested their interests in Trump Old Post Office LLC. *Id*. ¶ 18. Concerned about potential conflicts of interest, Ranking Member Cummings, along with the same three Representatives who joined in the first two requests, sent a letter to then GSA Acting Administrator Timothy Horne on January 23, 2017, asking GSA:

> (a) to explain the steps that GSA had taken, or planned to take, to address President Trump's apparent breach of the lease agreement; (b) to state whether GSA intended to notify President Trump's company that it is in breach; (c) to provide the monthly reports

5

President Trump's company submits to the GSA on the Trump International Hotel's revenues and expenses; (d) to explain and provide documentation of the steps GSA had taken, or planned to take, to address liens against the Trump International Hotel; and (e) to provide copies of all correspondence with representatives of President Trump's company or the Trump transition team.

*Id.* ¶ 19. GSA did not comply with the request. *Id.* ¶ 20. Instead, by letter dated February 6, 2017, GSA Acting Associate Administrator Saul Japson promised that "[s]hould the [House Oversight Committee] or any seven members thereof submit a request pursuant to 5 U.S.C. § 2954, GSA will review such a request." *Id.*

Members of the House Oversight Committee took Japson up on his invitation. On February 8, 2017, Ranking Member Cummings, joined by seven other committee members—all Democrats in the minority—sent a letter to Horne demanding the same documents related to the Old Post Office lease and, this time, specifically invoking section 2954. *Id.* ¶ 21. GSA did not respond to the February 8th letter. *Id.* ¶ 22. It did, however, issue two important public statements in the months that followed. First, on March 23, 2017, GSA issued a letter from a contracting officer asserting that Trump Old Post Office LLC was in full compliance with Article 37.19 of the lease. *Id.* ¶ 23. Second, in testimony before the House Committee on Appropriations in May 2017, Horne announced that GSA would comply with oversight requests from Democrats if joined by a Republican Chair of a committee. *Id.* ¶ 24. Horne did not acknowledge the Seven Member Rule in his testimony. *Id.*

Thereafter, Ranking Member Cummings and other minority members of the House Oversight Committee continued their pursuit of records. By letter dated June 5, 2017, Ranking Member Cummings, now joined by 17 other House Oversight Committee members (collectively

6

"Plaintiffs"),[3] renewed the demand for records made in the February 8th letter and requested additional records, including documents "containing legal interpretations of Section 37.19 of the Old Post Office lease" and "relating to funds received from any foreign country, foreign entity, or foreign source." *Id.* ¶ 25. In this letter, Plaintiffs also asserted that GSA's failure to provide the requested information violated section 2954; was "inconsistent with prior practices of both Republican and Democratic administrations and of GSA's prior practice to honor requests made under the Seven Member Rule"; and "thwart[ed] the ability of Committee members to carry out their congressionally-delegated duty to perform oversight." *Id.* Once more, GSA provided no response. Undeterred, on July 6, 2017, Plaintiffs sent a third letter demanding a response to their previous requests. *See id.* ¶ 26.

GSA responded in writing to this third demand, but produced no records. By letter dated July 17, 2017, GSA Associate Administrator P. Brennan Hart, III denied Plaintiffs' request, citing a recent Office of Legal Counsel ("OLC") memorandum. *Id.* ¶ 27. Quoting from the OLC memorandum, Hart's letter states that "[i]ndividual members of Congress, including ranking minority members, do not have authority to conduct oversight in the absence of a specific delegation by a full house, committee, or subcommittee," and that "the Executive Branch's longstanding policy has been to engage in the established process for accommodating congressional requests for information only when those requests come from a committee, subcommittee, or chairman authorized to conduct oversight." *Id.* (alteration in original); *see also* Pls.' Cross-Mot. for Summ. J. & Opp'n to Def.'s Mot. to Dismiss, ECF No. 11 [hereinafter Pls.'

---

[3] In both the June 5, 2017, letter referenced above, as well as the July 6, 2017, letter discussed below, Ranking Member Cummings was joined by 17 other minority members of the House Oversight Committee—only 16 of whom are Plaintiffs in this action. *Compare* Compl., *with* Pls.' Cross-Mot. for Summ. J. & Opp'n to Def.'s Mot. to Dismiss, ECF No. 11, Exs. 9–10, ECF Nos. 11-11 and 11-12. By collectively referring to the authors of these letters as "Plaintiffs," the court only intends to refer to those committee members named in this action, *see generally supra* note 1 (listing Plaintiffs).

Cross-Mot.], Ex. 11, ECF No. 11-13. The OLC memorandum did not, however, address requests made under section 2954. Compl. ¶ 28; *see also* Authority of Individual Members of Congress to Conduct Oversight of the Executive Branch, 2017 WL 5653624 (O.L.C. May 1, 2017). Three days later, on July 20, 2017, the White House changed course. It sent a letter to Senator Charles Grassley, stating that "the OLC opinion '*does not* set forth Administration policy' and that '[t]he Administration's policy is to respect the rights of all individual Members, regardless of party affiliation, to request information about Executive branch policies and programs.'" Compl. ¶ 29 (alteration in original) (emphasis added).

Notwithstanding this stated position, GSA still has yet to produce any records in direct response to Plaintiffs' Seven Member Rule requests. *See id.* ¶ 30. Instead, GSA has announced, apparently for the first time in this litigation, that it will treat Plaintiffs' requests as if made under the Freedom of Information Act ("FOIA"). *See* Def.'s Mot. to Dismiss, ECF No. 8, Def.'s Mem. of P. & A. [hereinafter Def.'s Mem.], at 10; Hr'g Tr., ECF No. 19, at 11. Not surprisingly, Plaintiffs are not satisfied with production pursuant to FOIA. *Cf.* Hr'g Tr. at 54–56.

## C. Procedural Background

Plaintiffs commenced this action against GSA's Administrator on November 2, 2017. *See generally* Compl. In their Complaint, Plaintiffs assert that Defendant's refusal to provide the requested information regarding GSA's implementation of the Old Post Office lease agreement with Trump Old Post Office LLC thwarts Plaintiffs' ability to:

> (a) evaluate the propriety of GSA's failure to enforce Article 37.19
> of the lease which, by its express terms, forbids President Donald

8

Trump, an "elected official of the Government of the United States," from benefiting from the lease in any way;

(b) evaluate GSA's oversight of the lease, including financial management of the lease;

(c) ascertain the amount of income from the lease benefiting President Donald Trump, his daughter Ivanka Trump, and his sons Donald, Jr., and Eric Trump;

(d) determine the extent to which Trump Old Post Office LLC has received funds from foreign countries, foreign entities, or other foreign sources;

(e) assess whether GSA's failure to act is based on a new interpretation of Article 37.19 of the lease, and if so, to review the legal opinion or opinions on which the new interpretation is based;

(f) evaluate whether the GSA contracting officer's decision that the Trump Old Post Office LLC is in compliance with the lease was free from inappropriate influence; and

(g) recommend to the [House Oversight] Committee, and to the House of Representatives, legislative and other actions that should be taken to cure any existing conflict of interest, mismanagement, or irregularity in federal contracting.

*Id.* ¶ 36. Plaintiffs seek a declaration that Defendant's failure to provide the requested information violates section 2954, and ask the court to order Defendant to produce the requested information without redactions. *See id.* ¶¶ 6, 30–31; *see also id.* at 13–14. As the statutory basis for their claims, Plaintiffs rely on the Administrative Procedure Act, 28 U.S.C. §§ 701 *et seq.*; the Mandamus Act, *see* 28 U.S.C. § 1361; the All Writs Act, 28 U.S.C. § 1651; and the Declaratory Judgment Act, *see* 28 U.S.C. §§ 2201–2202. *See* Compl. ¶¶ 6, 31–35.

On January 8, 2018, Defendant moved to dismiss the case pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See* Def.'s Mem. Defendant makes four separate arguments in her Motion to Dismiss. First, Defendant contends that Plaintiffs' claims must be dismissed for lack of subject-matter jurisdiction under Rule 12(b)(1) because Plaintiffs, as

individual Members of Congress, lack standing to vindicate the institutional interests of Congress as a whole. *Id.* at 1, 11–23. Second, Defendant argues that the court should dismiss Plaintiffs' claims under Rule 12(b)(6) for failure to state a claim, because neither section 2954 nor the other statutes on which Plaintiffs base their claims provide a cause of action. *Id.* at 2, 23–35. Third, Defendant maintains that the court should decline to hear this case under principles of equitable discretion. *Id.* at 35–36. And, finally, Defendant asserts that even if the court were to reach the merits, Plaintiffs' claims still fail, because their demands for records fall outside the scope of section 2954. *See id.* at 2–3, 36–39. As to this final argument, Defendant submits the term "any information" in section 2954 does not really mean "*any* information," but rather any information "contained in the agency reports that Congress abolished in 1928," *id.* at 39. Because the information that Plaintiffs requested is not covered by one of those 128 reports, Defendant argues, Plaintiffs have failed to state a violation of section 2954 in this case. *See id.*; *see also* Def.'s Reply & Opp'n to Pls.' Cross-Mot. for Summ. J., ECF No. 14, at 26–27.

Plaintiffs opposed Defendant's Motion on February 5, 2018, and simultaneously moved for summary judgment on the merits of their claims pursuant to Rule 56. *See generally* Pls.' Cross-Mot., Pls.' Mem. in Supp., ECF 11-1 [hereinafter Pls.' Mem.]. Plaintiffs maintain that section 2954 unambiguously requires GSA to provide the requested information about GSA's implementation of the Old Post Office lease, as such information falls squarely within the House Oversight Committee's jurisdiction and more than seven members have joined in the request. *See id.* at 5, 12–13, 20–21.

The court held oral argument on the parties' motions on July 12, 2018. Those motions are now ripe for consideration.

10

## III.    LEGAL STANDARD

Because standing implicates the court's subject-matter jurisdiction, *see Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015), the court first must consider Defendant's motion to dismiss under Rule 12(b)(1), *see Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) ("[A] federal court generally may not rule on the merits of a case without first determining that it has . . . subject-matter jurisdiction[ ] . . . ."); *Conference of State Bank Supervisors v. Office of Comptroller of Currency*, No. 17-cv-0763, 2018 WL 2023507, at *3 (D.D.C. Apr. 30, 2018) ("A motion to dismiss for lack of standing proceeds under Rule 12(b)(1) because 'the defect of standing is a defect in subject matter jurisdiction.'" (quoting *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987)).

When evaluating a Rule 12(b)(1) motion, the court "must . . . 'accept all [well-pleaded] factual allegations in [the] complaint as true.'" *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005) (third alteration in original) (quoting *United States v. Gaubert*, 499 U.S. 315, 327 (1991)). Additionally, the court may consider materials outside the pleadings "as it deems appropriate to resolve the question whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics,* 104 F. Supp. 2d 18, 22 (D.D.C. 2000); *see also Herbert v. Nat'l Acad. of Scis.*, 974 F. 2d 192, 197 (D.C. Cir. 1992) ("[W]here necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."). The plaintiff bears the burden of establishing that the court has subject-matter jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

## IV.    DISCUSSION

The threshold—and, ultimately, dispositive—issue in this case is whether Plaintiffs, as individual members of the House Oversight Committee, have standing to sue GSA to produce the records requested under section 2954.

The doctrine of standing derives from Article III, section 2, of the U.S. Constitution, which limits the jurisdiction of federal courts to "Cases" or "Controversies."  U.S. Const. art. III, § 2; *Lujan*, 504 U.S. at 560.  The standing inquiry focuses on whether the plaintiff is the proper party to bring an action. *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2663 (2015).  "[T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers," *Raines v. Byrd*, 521 U.S. 811, 820 (1997) (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984)), and "the proper—and properly limited—role of the courts in a democratic society," *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  These concerns "are particularly acute" where, as here, "a legislator attempts to bring an essentially political dispute into a judicial forum." *Chenoweth v. Clinton*, 181 F.3d 112, 114 (D.C. Cir. 1999).

"The 'irreducible constitutional minimum of standing contains three elements': [1] injury in fact, [2] causation, and [3] redressability." *Arpaio*, 797 F.3d at 19 (quoting *Lujan*, 504 U.S. at 560).  At issue in this case is the first prong of the standing analysis—whether Plaintiffs have suffered a legally cognizable injury in fact.  There is no dispute as to the other two.  To establish an injury in fact, a plaintiff must demonstrate that the alleged injury is "personal, particularized, concrete, and otherwise judicially cognizable." *Raines*, 521 U.S. at 820.  With respect to these first two requirements, the Supreme Court has "consistently stressed that a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him." *Id*. at 819.  As to the last two requirements, the Court has

emphasized that the plaintiff must have suffered "an invasion of a legally protected interest which is . . . concrete," *id.* (quoting *Lujan*, 504 U.S. at 560), and that the dispute must be one "traditionally thought to be capable of resolution" by the courts, *id.* (quoting *Flast v. Cohen*, 392 U.S. 83, 97 (1968)).

Although these general standing principles frame the question presented here, the outcome of the case in large part turns on application of the Supreme Court's decision in *Raines v. Byrd*. The court therefore starts with a detailed discussion of *Raines* before addressing the parties' specific arguments.

### A. *Raines v. Byrd*

In *Raines*, six individual Members of Congress sued the Secretary of Treasury and the Director of the Office of Management and Budget seeking a declaration that the Line Item Veto Act, which had passed both houses of Congress over the plaintiffs' "nay" votes, was unconstitutional. 521 U.S. at 814. The Act authorized the President to "cancel" certain spending and tax measures after signing a bill into law, unless the cancellation was subsequently overridden by Congress by joint resolution. *Id.* The Act also provided that any Member of Congress or individual adversely affected by the Act could bring an action challenging any provision of the Act as unconstitutional. *Id.* at 815–16. The plaintiffs filed suit under that provision, claiming that the Act constituted an unconstitutional expansion of presidential authority and violated the requirements of bicameral passage and presentment by allowing the President alone "to cancel and thus repeal provisions of federal law." *Id.* at 816 (internal quotation marks omitted). They further alleged that the Line Item Veto Act injured them directly and concretely by:

> (a) alter[ing] the legal and practical effect of all votes they may cast on bills containing such separately vetoable items, (b) divest[ing] the [plaintiffs] of their constitutional role in the repeal of legislation, and (c) alter[ing] the constitutional balance of powers between the

13

> Legislative and Executive Branches, both with respect to measures containing separately vetoable items and with respect to other matters coming before Congress.

*Id.* (internal quotation marks omitted).

The defendants moved to dismiss for lack of jurisdiction, arguing that the plaintiffs did not have standing to sue. *Id.* Both parties also filed motions for summary judgment on the merits. *Id.* The district court denied the defendants' motion to dismiss and granted the plaintiffs' summary judgment motion, holding that the Line Item Veto Act was unconstitutional. *Id.* On direct appeal, the Supreme Court vacated the judgment of the district court, *see id.* at 817–18, holding that the plaintiffs lacked Article III standing because they "[did] not have a sufficient 'personal stake' in th[e] dispute and ha[d] not alleged a sufficiently concrete injury," *id.* at 830. In finding no "legislative standing," *see id.* at 820, the Court distinguished two prior cases in which it had determined that legislators did have standing to bring suit: *Powell v. McCormack*, 395 U.S. 486 (1969), and *Coleman v. Miller*, 307 U.S. 433 (1939). *See Raines*, 521 U.S. at 820–26.

Starting with *Powell*, the Court explained that the *Raines* plaintiffs did not possess what was present in *Powell*: a sufficiently *personal* injury. *See Raines*, 521 U.S. at 821. In *Powell*, the U.S. House of Representatives refused to seat the plaintiff, Adam Clayton Powell, Jr., for making false reports about travel expenses and diverting House funds to his wife in the form of illegal salary payments. 395 U.S. at 490, 492–93. Powell challenged the constitutionality of his exclusion (and his consequent loss of salary), arguing that the House could not prevent a duly elected person from taking his seat for any reason other than the failure to meet the age, citizenship, and residence requirements contained in Article I, section 2, of the Constitution—"requirements the House specifically found Powell met." *Id.* at 489. The Supreme Court ultimately held that Powell's challenge presented an Article III case or controversy. *See id.* at 495–96, 512, 517–18, 549–50.

14

In *Raines*, the Court distinguished its decision in *Powell* on two key grounds, which merit quotation in full:

> *Powell* does not help [plaintiffs]. **First**, [plaintiffs] have not been singled out for specially unfavorable treatment as opposed to other Members of their respective bodies. Their claim is that the Act causes a type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally. **Second**, [plaintiffs] do not claim that they have been deprived of something to which they *personally* are entitled—such as their seats as Members of Congress after their constituents had elected *them*. Rather, [plaintiffs'] claim of standing is based on a loss of political power, not loss of any private right, which would make the injury more concrete. Unlike the injury claimed by Congressman Adam Clayton Powell, the injury claimed by the Members of Congress here is not claimed in any private capacity but solely because they are Members of Congress. If one of the Members were to retire tomorrow, he would no longer have a claim; the claim would be possessed by his successor instead. The claimed injury thus runs (in a sense) with the Member's seat, a seat which the Member holds (it may quite arguably be said) as trustee for his constituents, not as a prerogative of personal power.

*Raines*, 521 U.S. at 821 (first and second emphases added) (citations omitted).

The Court then proceeded to distinguish its prior decision in *Coleman v. Miller*, which the Court characterized as "[t]he one case in which we have upheld standing for legislators (albeit *state* legislators) claiming an institutional injury." *Raines*, 521 U.S. at 821. In *Coleman*, 20 of Kansas' 40 state senators voted not to ratify the proposed "Child Labor Amendment" to the Federal Constitution. 307 U.S. at 435–36. The vote deadlocked, such that the amendment ordinarily would not have been ratified. *Id.* at 436. To break this tie, the Lieutenant Governor, the presiding officer of the State Senate, cast a vote in favor of the amendment, and the amendment was deemed ratified (after the State House of Representatives voted to ratify it). *Id.* The 20 state senators who had voted against the amendment, joined by another state senator and three members of the State House of Representatives, challenged the right of the Lieutenant Governor to cast the deciding vote, and

sought a writ of mandamus to compel state officials to recognize that the legislature had not in fact ratified the amendment. *Id.* The Supreme Court held that the 20 state senators who had voted against the amendment had standing to sue because their "votes against ratification [had] been overridden and virtually held for naught although . . . their votes would have been sufficient to defeat ratification." *Id*. at 438. Because the state senators had "a plain, direct and adequate interest in maintaining the effectiveness of their votes," the Court held that the plaintiffs had standing. *See id*. at 437–38.

In *Raines*, the Court explained that a key factor of its decision in *Coleman* was that the senators' "votes not to ratify the amendment were deprived of all validity." *Raines*, 521 U.S. at 823. The Court in *Raines* then explicitly limited the scope of its holding in *Coleman*:

> It is obvious, then, that our holding in *Coleman* stands (at most . . .) for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been *completely nullified*.

*Id*. (emphasis added); *accord Chenoweth*, 181 F.3d at 116–17; *see also Campbell v. Clinton*, 203 F.3d 19, 23 (D.C. Cir. 2000) (characterizing *Coleman* as "a very narrow possible . . . exception to *Raines*").

With the reach of *Coleman* now limited, the Court concluded that the *Raines* plaintiffs' claim "obvious[ly]" did not fall within its holding in *Coleman*, because the plaintiffs did not allege "that they voted for a specific bill, that there were sufficient votes to pass the bill, and that the bill was nonetheless deemed defeated." *Raines*, 521 U.S. at 824. To the contrary, the plaintiffs' votes on the Line Item Veto Act "were give full effect," but the plaintiffs "simply lost that vote." *Id*. Similarly, the Court reasoned that the plaintiffs could not allege that the Act would "nullify their votes in the future in the same way that the votes of the *Coleman* legislators had been nullified,"

16

*id.*, because the *Raines* plaintiffs had a sufficient legislative remedy, *see id.* (noting that Congress could still pass or reject appropriations bills, or even repeal the Act or exempt a given appropriations bill or provision therein from its reach); *see also Campbell*, 203 F.3d at 22–23. Furthermore, while the plaintiffs attempted to shoehorn their case into the *Coleman* mold by suggesting that the Line Item Veto Act reduced the "effectiveness," "meaning," and "integrity" of their votes by allowing the President to cancel certain spending projects, the court rejected this argument. *Raines*, 521 U.S. at 825. Instead, the Court found that there was "a vast difference between the level of vote nullification at issue in *Coleman* and the abstract dilution of institutional legislative power" alleged in *Raines*. *Id.* at 826. Thus, the Court ultimately refused to extend *Coleman* to uphold standing for the plaintiffs in *Raines*. *Id.*

The Court did not end its analysis there, however. It went on to find that "historical practice appear[ed] to cut against" the plaintiffs, as well. *See id.* The Court explained that in several similar disputes between one or both Houses of Congress and the Executive Branch, neither branch of government had brought suit based on a claimed injury to official authority or power. *Id.* at 826–28. Based on that history, the Court reasoned, a system in which the judiciary waded in to resolve such claims "is obviously not the regime that has obtained under our Constitution to date," which "contemplates a more restricted role for Article III courts." *Id.* at 828.

In light of the foregoing analysis, the Court ultimately held that the individual Members of Congress in *Raines* lacked standing to sue because they "alleged no injury to themselves as individuals (contra, *Powell*), the institutional injury they allege[d] [was] wholly abstract and widely dispersed (contra, *Coleman*), and their attempt to litigate this dispute at this time and in this forum [was] contrary to historical experience." *Id.* at 829. Importantly, the Court also identified several other factors that it found relevant to its decision. For instance, the Court "attach[ed] some

17

importance" to the fact that the plaintiffs "ha[d] not been authorized to represent their respective Houses of Congress in this action, and indeed, both Houses actively oppose[d] their suit." *Id.* Additionally, the Court noted that its holding "neither deprive[d] Members of Congress of an adequate remedy . . . nor foreclose[d]" the possibility of a future constitutional challenge in court, as long it was brought by someone "who suffer[ed] judicially cognizable injury." *Id*. at 829–30.

*       *       *

To summarize, the following principles emerge from *Raines*. Individual Members of Congress generally do not have standing to vindicate the institutional interests of the house in which they serve. This means that Members of Congress may go to court to demand something to which they are privately entitled, *see Powell*, 395 U.S. 486, but they cannot claim harm suffered solely in their official capacities as legislators that "damages all Members of Congress and both Houses of Congress equally," *see Raines*, 521 U.S. at 821, 829; *cf. Arizona*, 135 S. Ct. at 2664. Otherwise, to establish standing under *Raines*, individual Members of Congress alleging *institutional* injury must, at the very least, assert an injury that is neither "wholly abstract" nor "widely dispersed." *Walker v. Cheney*, 230 F. Supp. 2d 51, 64 (D.D.C. 2002) (quoting *Raines*, 521 U.S. at 829).

Complete vote nullification is clearly a type of an institutional injury sufficient to support legislator standing. *See Raines*, 521 U.S. at 826 ("There is a vast difference between the level of vote nullification at issue in *Coleman* and the abstract dilution of legislative power that is alleged here."); *id.* at 829 (explaining that the "institutional injury" alleged by the plaintiffs was "wholly abstract and widely dispersed (contra, *Coleman*)"). What is less clear, however, is whether vote nullification is the *only* type of institutional injury that grants *individual legislators* standing to seek redress consistent with *Raines*. Courts in this District have recognized, at least implicitly,

18

that other types of institutional injuries can be redressed by Article III courts. Those cases, however, have arisen almost exclusively in the subpoena enforcement context and have involved circumstances in which the plaintiff was a congressional committee that was "duly authorized" to bring suit by House resolution. *See, e.g.*, *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1, 14, 20–22 (D.D.C. 2013); *Comm. on Judiciary v. Miers*, 558 F. Supp. 2d 53, 71 (D.D.C. 2008). In those cases, courts have found congressional authorization to be the "key" distinguishing factor, "mov[ing] th[e] case from the impermissible category of an individual plaintiff asserting an institutional injury" in *Raines* "to the permissible category of an institutional plaintiff asserting an institutional injury." *Miers*, 558 F. Supp. 2d at 71; *accord Holder*, 979 F. Supp. 2d at 14, 20–22; *cf. U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 67, 71–72 (D.D.C. 2015) (noting in a case involving an appropriations challenge to the Affordable Care Act that the plaintiff was the "House of Representatives, duly authorized to sue as an institution, not individual members as in *Raines*," which the court found to be a "critical" distinction).

This case then presents a unique factual circumstance. Individual Members of Congress are seeking to vindicate a statutory right to information and to compel the production of records from the Executive Branch *without* authorization from the institution to do so. Do they have standing consistent with *Raines*? The court now turns to answer that question.

### B.    Application of *Raines*

#### 1.    *Does the Statutory Right Here Make This Case Different From* Raines*?*

To begin, Plaintiffs contend that this case falls outside of *Raines*, because the informational injury they assert is sufficient to confer standing under the Supreme Court's decision in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016). *See* Pls.' Mem. at 23–25. According to Plaintiffs, the

19

denial of information requested under section 2954 itself constitutes an injury in fact, as the Supreme Court "has often held that deprivation of a statutory right to access to information constitutes injury." *Id.* at 24.

To be sure, the Supreme Court in *Spokeo* recognized that the deprivation of a statutory right to information can be a sufficiently personal, particularized, and concrete injury. *See* 136 S. Ct. at 1548; *id.* at 1549–50 (citing *FEC v. Akins*, 524 U.S. 11, 20–25 (1998); and *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989)); *see also Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (explaining that the deprivation of a statutory right to information constitutes a "sufficiently concrete and particularized" injury where the plaintiff "suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure"). This is true even when a statute broadly confers a general right to access to information on "any person." *See Akins*, 524 U.S. at 19–21, 24–25 (holding that a group of voters' "inability to obtain information" subject to public disclosure under the Federal Election Campaign Act constituted an "injury in fact"); *cf. Public Citizen*, 491 U.S. at 447–50 (holding that two advocacy organizations had standing to sue the Department of Justice for refusal to provide information subject to disclosure under the Federal Advisory Committee Act because they had suffered "a sufficiently distinct injury"). Plaintiffs therefore are correct that individuals may sustain an injury in fact when they are denied a statutory right to information. *See Spokeo*, 136 S. Ct. at 1549–50; *see also Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*, 879 F.3d 339, 343–44 (D.C. Cir. 2018).

But *Spokeo* also made clear that the mere denial of a statutory right does not automatically give rise to a cognizable injury in fact for purposes of Article III standing. The Court stated:

> Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact

20

> requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. Article III standing requires a concrete injury even in the context of a statutory violation.

*Spokeo*, 136 S. Ct. at 1549; *see also id.* at 1547–48 ("[I]t is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." (quoting *Raines*, 521 U.S. at 820 n.3)). *Spokeo* itself cites to *Raines*, in which the Court refused to recognize standing even though Congress had specifically granted Members the statutory right to challenge the constitutionality of the Line Item Veto Act. *See Raines*, 521 U.S. at 815–16, 829–30. Thus, the mere fact that Plaintiffs here have been denied a statutory right to information conferred by the Seven Member Rule cannot alone resolve the standing question.

The other Supreme Court decisions on which Plaintiffs rely—*Akins* and *Public Citizen*—do not compel a different result. *See* Pls.' Mem. at 24–25. In both cases, the statutes at issue entitled members of the public, not Members of Congress, to request agency records. *See Akins*, 524 U.S. at 19; *Public Citizen*, 491 U.S. at 446–47. Also, in both cases the suits were "*brought by private parties, not government officials*, and thus involved injuries in which the plaintiffs (having no official, governmental interests) had only a personal stake." *Walker*, 230 F. Supp. 2d at 66 n.10 (emphasis added). Thus, the personal/institutional injury distinction made in *Raines*, which rests at the heart of this case, had no application in either *Akins* or *Public Citizen*. Therefore, it is not simply enough for this particular group of plaintiffs to point to an informational injury arising from an unmet statutory demand to demonstrate standing. They must establish standing consistent with *Raines*.

21

## 2. *Plaintiffs Allege Institutional, Not Personal, Injury*

The parties here agree on one thing about *Raines*: In cases such as this one, where suit is brought by individual Members of Congress, *Raines* establishes a binary rubric of potential injuries for purposes of assessing standing. Stated more simply, they agree that the alleged injury in such cases is either personal or institutional. *See* Def.'s Mem. at 15–22; *cf.* Pls.' Mem. at 27; Hr'g Tr. at 28–29. Where the parties part ways, however, is in characterizing the type of injury Plaintiffs claimed to have suffered here.

Defendant contends that GSA's non-response to Plaintiffs' Seven Member Rule requests is not an injury that is personal to Plaintiffs. Rather, when Plaintiffs seek information from the Executive Branch pursuant to section 2954, Defendant argues, "they do so exclusively in their capacities as members of the Oversight Committee" for "the benefit of the entire House." Def.'s Mem. at 15. Defendant notes that, just as in *Raines*, if Plaintiffs were to retire tomorrow, they would no longer be entitled to request information under section 2954. *Id.* at 16. Plaintiffs push back on this logic, arguing that the injury they allege is sufficiently personal and particularized as to them as minority members of the House Oversight Committee whose Seven Member Rule requests were denied. Pls.' Mem. at 27–28. The fact that they suffered injury in their official capacities as legislators, Plaintiffs insist, does not disqualify the injury as one that is sufficiently personal to them. *Id.* Notably, only one other federal court has addressed this issue, and it ruled that individual members of the House Oversight Committee did not suffer a personal injury when their Seven Member Rule request went unanswered. *See Waxman v. Thompson ("Waxman II")*, No. 04-03467, 2006 WL 8432224, at *6–12 (C.D. Cal. July 24, 2006).

This court agrees with Defendant and the court in *Waxman II* that Plaintiffs did not suffer a "personal" injury, as the term is used in *Raines*, by GSA's failure to produce documents in

response to their Seven Member Rule requests. Plaintiffs' injury arises not "in any private capacity," but "solely because they are Members of Congress." *Raines*, 521 U.S. at 821. Plaintiffs' Complaint makes this clear, as it characterizes their injury as a "depriv[ation] . . . of information to which they are entitled by law" under section 2954 as a group of at least seven members of the House Oversight Committee. Compl. ¶ 36; *see id.* ¶ 31. Indeed, Plaintiffs tie their injury directly to their constitutional duties as legislators, claiming their alleged harm to be the "impedance of the oversight and legislative responsibilities that have been delegated to them by Congress." *Id.* ¶ 36; *see also* Pls.' Mem. at 22 (describing Plaintiffs' injury as "the deprivation of information to which they are entitled by law and that they need *in order to perform their congressionally-delegated oversight function*" (emphasis added)). Thus, Plaintiffs do not assert a loss of any "private right." *See Raines*, 521 U.S. at 821. Additionally, just as in *Raines*, "[i]f one of the [Plaintiffs] were to retire tomorrow, he would no longer have a claim." *Id.* The alleged injury therefore "runs (in a sense) with the [Plaintiff's] seat," which is not held "as a prerogative of personal power." *Id.* [4]

Notwithstanding these parallels to *Raines*, Plaintiffs insist that they have suffered a "personal" injury. *See generally* Pls.' Mem. at 22–29. According to Plaintiffs, *Raines*' definition of personal injury does not exclude injury suffered in legislators' official capacities, because *Raines* reaffirms *Powell* and *Coleman* and thus makes clear that "legislators have standing to bring suit where an injury is personal to them, even when their injury is inextricably tied to their positions as members of the legislature." *Id.* at 27; *see also id.* at 28 ("[I]n *Powell* and *Coleman*, the Court clearly understood the 'personal injury' element to require only that the injury be suffered by an

---

[4] As the court in *Waxman II* observed, "[t]he right does not, strictly speaking, 'run' with the seat, since a successor to one of the named plaintiffs might not be named to the [House Oversight] Committee, or if designated a member of that committee, might not join in a request for information," and "[s]uch a member would not have standing to challenge the denial of his or her predecessor's records request." 2006 WL 8432224, at *8 n.26. Nevertheless, if a plaintiff in this case were to retire, the claim as to that plaintiff would not survive his or her retirement. *See id.* at *8.

identifiable party rather than the institution itself, and not that the right infringed must be 'personal' in the sense of being private."). Plaintiffs therefore contend that their asserted injury is "personal" to them as individual members of the House Oversight Committee who joined in the Seven Member Rule requests, even if the informational right is suffered in their official capacities as legislators and thus not personal in the sense of being "private." *See id.* at 27–28.

Try as they may, Plaintiffs cannot shape their claimed harm into the type of "personal" injury recognized in *Raines* as sufficient to confer standing on an individual Member of Congress. That conclusion is clear in light of the *Raines* Court's distinguishing of *Powell*. In *Powell*, the underlying question was whether Adam Clayton Powell, Jr., an American citizen having met the age and residency requirements laid out in the Constitution and having been elected to the U.S. House of Representatives, had a right to be seated despite the House of Representative's refusal to seat him. *See* 395 U.S. at 489. The Court in *Raines* described Powell's claim as asserting a "private right," that is, the right to be seated in the House as a result of his election by his constituents. *See* 521 U.S. at 821. By contrast, the Court continued, the plaintiffs in *Raines* had not been "deprived of something to which they *personally* are entitled"; rather, their injury was claimed "not . . . in any private capacity but solely because they [were] Members of Congress." *Id.* So, too, here. Plaintiffs' rights under the Seven Member Rule derive solely from their membership in the House of Representatives and, even more specifically, their assignment to the House Oversight Committee. Again, if a Plaintiff here were to lose her seat, she likewise would lose all rights under the Seven Member Rule.

Plaintiffs further argue that the informational injury they suffered is personal because, "in sharp contrast to *Raines*, . . . all Members of Congress of both Houses [do not] share this injury 'equally,' which is how *Raines* defined 'institutional injury.'" Pls.' Mem. at 27 (quoting *Raines*,

24

521 U.S. at 821).  But in *Raines*, the Court merely observed that the plaintiffs there, unlike Powell, had "not been singled out for specially unfavorable treatment" and, in that sense, had asserted "a type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally." *Raines*, 521 U.S. at 821.  The same is true here.  Plaintiffs have not been "singled out for specially unfavorable treatment" like Adam Clayton Powell.  Rather, their claimed injury is institutional because it is rooted in a right granted to them as Members of Congress.  True, the deprivation of that right is not necessarily shared "equally" by "every member of the Committee, let alone every member of the House or Congress." *See* Pls.' Mem. at 24, 27.  Thus, in some sense, Plaintiffs' injury as seventeen members of the House Oversight Committee who joined in the Seven Member Rule requests is more particularized than the injury in *Raines*.  But the fact that all Members might not share in the informational harm Plaintiffs claim is not *the* distinguishing feature between a personal and institutional injury under *Raines*.  As the foregoing discussion makes clear, the *Raines* Court distinguished the injury asserted in *Powell* not only because the *Raines* plaintiffs suffered an injury that "necessarily damages all Members of Congress . . . equally," but also because they failed to claim that they had been "deprived of something to which they *personally* are entitled," which would have made the injury "more concrete." *Raines*, 521 U.S. at 821.  In other words, the Court did not suggest that an injury qualifies as "personal" simply because it is not shared equally by every other Member of Congress. *See Walker*, 230 F. Supp. 2d at 64, 66–68.  Thus, the fact that Plaintiffs' injury is more particularized than the plaintiffs' injury in *Raines* does not render Plaintiffs' injury analogous to the one suffered by Powell. *Cf. Common Cause v. Biden*, 909 F. Supp. 2d 9, 24 (D.D.C. 2012) (noting that in order to qualify for the *Powell* "exception[]" to the legislative standing doctrine

25

announced in *Raines*, individual Congress members must have been "*individually* deprived of something they are *personally* entitled to" (emphases added)).

Nor does *Coleman* help Plaintiffs to define their injury as "personal" in nature. Admittedly, like the plaintiffs in *Coleman* who were found to have standing, Plaintiffs here assert injury arising in their official capacities. But the parallel goes no further. The *Raines* Court cited *Coleman* as an exception to the general rule that institutional injury cannot confer standing upon an individual Congress member, and not as an example of a case in which a legal interest stemming from a plaintiff's official status as a legislator can give rise to a *private* injury. *See Raines*, 521 U.S. at 821 ("The one case in which we have upheld standing for legislators . . . claiming an *institutional* injury is *Coleman* . . . ." (emphasis added)). Furthermore, the Court strictly cabined this exception in *Raines*, requiring complete vote nullification. *Id.* at 823–24; *accord Chenoweth*, 181 F.3d at 116–17; *accord Campbell*, 203 F.3d at 22–23. Vote nullification is not at issue here.

The foregoing conclusions are consistent with another decision from this District Court, *Walker v. Cheney*. There, the court held that the Comptroller General of the United States lacked standing to sue to enforce a request to Vice President Dick Cheney for information regarding the National Energy Policy Development Group ("NEPDG"). *See* 230 F. Supp. 2d at 52–53. The Comptroller General, as the head of the General Accounting Office and an agent of Congress, has authority under various statutes to carry out investigations for the benefit of Congress. *See id.* at 53–54. When the requested records were not forthcoming, the Comptroller General sued Vice President Cheney, NEPDG's Chair. *Id.* at 53, 58. The *Walker* court held that the Comptroller General lacked standing, in part because he had failed to show any harm suffered in a private sense. *Id.* at 65–66, 74. While the "Vice President's refusal to disclose the requested documents may have frustrated plaintiff in his efforts to fulfill his statutory role," the court found that "plaintiff

26

himself ha[d] no personal stake in th[e] dispute." *Id.* at 66. The plaintiff did not claim that he had "been deprived of something to which he personally [was] entitled." *Id.* (cleaned up) (quoting *Raines*, 521 U.S. at 821). Rather, his interest in the dispute was "solely institutional, relating exclusively to his duties in his official capacity as Comptroller General of the United States." *Id.*

Like the Comptroller General, Plaintiffs here have not "been deprived of something to which [they] *personally* are entitled," *Raines*, 521 U.S. at 821, and thus lack a personal stake in this dispute. Their interests in this action—gaining access to information related to GSA's lease with Trump Old Post Office LLC in order to carry out their oversight responsibilities—relate "exclusively to [their] duties in [their] official capacit[ies] as" members of the House Oversight Committee. *See Walker*, 230 F. Supp. 2d at 66. Thus, because Plaintiffs only allege harm stemming from their official status as legislators, as opposed to injury suffered in their private capacities, Plaintiffs fail to allege sufficiently personal injury under *Raines*.

### 3. Plaintiffs' Claimed Institutional Injury Is Insufficient to Confer Standing

Because Plaintiffs fail to assert a personal injury, the question remains whether they have suffered the type of *institutional* injury that is sufficient to confer standing. *See* Hr'g Tr. at 28–29 (arguing that even if the court characterizes Plaintiffs' injury as institutional in nature, their injury is distinguishable from the harm asserted in *Raines* because it is sufficiently concrete and particularized to Plaintiffs). That question raises a threshold issue: Does *Coleman* provide the only exception to *Raines*' general prohibition of legislator standing to assert institutional injuries? If the answer is "yes," as Defendant claims, then the court's standing analysis is relatively simple, as Plaintiffs clearly do not fit the narrow *Coleman* exception. If the answer is "no," however, that

invites two questions: What other types of institutional injuries are sufficiently concrete and particularized to pass muster under *Raines*, and does Plaintiffs' claimed injury here fit that bill?

As the discussion suggests, the answer to these questions is not clear. Far from it. *See generally* Matthew I. Hall, *Making Sense of Legislative Standing*, 90 S. Cal. L. Rev. 1 (2016). On the one hand, Circuit precedent appears to lend some support to Defendant's argument that complete vote nullification is the one and only exception to the general rule in *Raines* that individual legislators lack standing to assert institutional injuries. *See* Def.'s Mem. at 15, 17–18; *see also* Anthony Clark Arend & Catherine B. Lotrionte, *Congress Goes to Court: The Past, Present, and Future of Legislator Standing*, 25 Harv. J.L. & Pub. Pol'y 209, 273 (2001) ("[T]he D.C. Circuit has seemed to acknowledge that a nullification of a vote is the *only* basis for legislator standing."). For example, in its most recent case on the subject, the D.C. Circuit characterized *Coleman* as "a soft spot in the legal barrier against congressional legal challenges to executive action" and "the very narrow possible . . . exception to *Raines*." *Campbell*, 203 F.3d at 21, 23.

At the same time, however, all of the relevant cases in this jurisdiction that have referenced and distinguished *Coleman* as a narrow and unmet exception—including *Campbell*—have involved, like *Raines*, an alleged dilution of voting power. *See Campbell*, 203 F.3d at 19–20, 22 (noting, in suit challenging an executive order that directed the U.S. armed forces' participation in NATO airstrikes in Yugoslavia without congressional authorization, that the plaintiff congressmen "sought to fit within the *Coleman* exception to the *Raines* rule" by "specifically defeating the War Powers Resolution authorization by a tie vote and by defeating a declaration of war"); *cf. Chenoweth*, 181 F.3d at 113, 116–17 (explaining that the plaintiffs' claim of standing was predicated on theory that by introducing a particular initiative via executive order rather than statute, the President denied them "their constitutionally guaranteed responsibility of open debate

28

and vote on issues and legislation," thereby "diminish[ing] their power as Members of Congress," and holding that such theory did not satisfy *Coleman*'s vote nullification standard); *Common Cause*, 909 F. Supp. 2d at 14, 23, 24–27 (holding that House Representative plaintiffs failed to satisfy "*Coleman* exception" in suit challenging the Senate's Cloture Rule on grounds that it prevented a simple majority in the Senate from closing debate on and passing certain legislation, thereby nullifying the votes personally cast by plaintiffs in favor of such legislation).

The alleged injury in this case, by contrast, is "the deprivation of information to which [Plaintiffs] are entitled by law and that they need in order to perform their congressionally-delegated oversight function" as members of the House Oversight Committee. Pls.' Mem. at 22; *see* Compl. ¶ 36. Thus, at least on the facts presented here, whether *Coleman*'s complete nullification standard represents the only exception to *Raines*' general prohibition on suits alleging institutional injury—or whether *Raines* permits a legislator to assert other institutional injuries that are sufficiently concrete and particularized—is arguably an open question. *See Walker*, 230 F. Supp. 2d at 66–68 (reasoning that any possible *institutional* injury to Congress' legislative and oversight functions caused by Executive's failure to produce records was too "vague and amorphous" to confer standing under *Raines*, without any mention of *Coleman*).[5]

This court is not of the view that complete vote nullification is the *only* instance in which an individual legislator can assert institutional injury consistent with *Raines*. As discussed above, because the plaintiffs in *Raines* claimed that they had an adequate interest in maintaining the "effectiveness of their votes" like the plaintiffs in *Coleman*, *Raines* arguably left open the question

---

[5] *See generally Hall*, *supra*, at 4, 23 (arguing that "confusion and inconsistency in legislative standing doctrine" is attributable to the doctrine's use in "a multitude of distinct and unrelated types of claims that have little in common other than the presence of a legislative litigant," and further noting that the Supreme Court "has never mustered a majority definitively to explain the continuing relevance of *Coleman* or the principles that guide the determination of which institutional injuries can be litigated, and by whom").

whether individual Members of Congress have standing to assert other types of institutional injuries outside the vote dilution context. The Court seemed to suggest as much when, in closing, it observed that "the institutional injury [the plaintiffs] allege is wholly abstract and widely dispersed (contra, *Coleman*)." *Raines*, 521 U.S. at 829. Might a claimed institutional injury that is *neither* "wholly abstract" *nor* "widely dispersed" suffice to confer standing on an individual Member of Congress?

Arguably, this is such a case. Section 2954 is unique in that it grants a statutory right to seven members of the House Oversight Committee—a true minority (seven Members) of a minority of the House of Representatives (those Members on the Oversight Committee)—to request and receive information from an Executive agency, provided that information falls within the Committee's jurisdiction. The denial of a Seven Member Rule request, although not a personal injury, is a more particularized type of institutional injury than a general diminution of legislative power, such as the dilution of the efficacy of Congress members' votes (e.g., *Raines*) or the deprivation of their right to participate and vote in manner prescribed by the Constitution (e.g., *Chenoweth*). Those types of injuries, by definition, affect all Members *equally*. Here, by contrast, not every Member even possesses the right to make a Seven Member Rule request—only a small percentage do and, even then, it must be a collective demand. So, the injury brought upon by a denial of a Seven Member Rule request cannot genuinely be said to apply equally to all Members. It falls specifically on the Members that made the demand and therefore is not "widely dispersed."

Additionally, the rejection of a Seven Member Rule request is more concrete than, say, again, a claim of vote dilution. Courts have not, for instance, doubted in the congressional subpoena enforcement context that the Executive Branch's refusal to produce records is a sufficiently concrete injury. *See, e.g.*, *Miers*, 558 F. Supp. 2d at 71; *see also Holder*, 979 F. Supp.

30

2d at 20–22. At least in terms of concreteness, it is hard to conceive of a material difference between this case—a suit to enforce a congressional records demand—and a subpoena enforcement case—a suit to enforce a congressional records demand. Thus, to the extent that *Raines* demands that an individual Member of Congress have an injury that is both concrete and particularized to vindicate an institutional injury, this case bears those characteristics in a way that other cases post-*Raines* have not.[6] Accordingly, the court finds that Plaintiffs have made a stronger case than the plaintiffs in *Raines* that they have suffered the type of institutional injury that could potentially establish Article III standing.

But that is not the end of the analysis. The Court in *Raines* instructed that, when evaluating the standing of a Member of Congress, courts also must consider "historical experience," 521 U.S. at 829, as well as several other factors, including whether the Member has been "authorized to represent" the house of Congress in which she serves and the availability of an "adequate remedy," *see id. Accord Walker*, 230 F. Supp. 2d at 64–65, 68–74. Here, these additional considerations all weigh heavily against recognizing standing in this case. As discussed in further detail below, the absence of any historical precedent for enforcing Seven Member Rule demands in federal court, the lack of authorization from the House of Representatives to bring suit, and the availability of political avenues of redress, all compel the conclusion that Plaintiffs—although perhaps

---

[6] The court recognizes that *Walker*, a case that also involved an effort to enforce a congressional demand for documents from the Executive Branch, came to a different conclusion on institutional injury. *See* 230 F. Supp. 2d at 66–68. But *Walker* can be distinguished, at least in part, based on *who* made the records demand. There, the demand for information from the Executive Branch was made by "an agent of the Legislative Branch," the Comptroller General, who is the head of the General Accounting Office. *Id.* at 53. This "subservient" relationship to Congress is the difference between *Walker* and this case. *See id.* at 66 (citing *Bowsher v. Synar*, 478 U.S. 714, 730 (1986)). By virtue of Congress' principal-agent relationship with the Comptroller General, the injury in *Walker* was shared equally by all Members of Congress, as it was the institution's agent who was thwarted in his records demand. Here, by contrast, there is no agency relationship between Plaintiffs, individually or collectively, and the House of Representatives or the House Oversight Committee. Their injury is particular to them, not the institution through its agent as in *Walker*.

suffering a more particularized and concrete institutional injury than the plaintiffs in *Raines*—lack standing to bring this action.

a.    Historical Practice

In *Raines*, the Supreme Court looked to "historical practice to determine whether the claims [the] plaintiffs asserted in that case were the sort that had traditionally been adjudicated by Article III courts." *Waxman II*, 2006 WL 8432224, at *13 (citing *Raines*, 521 U.S. at 826–29); *see also Walker*, 230 F. Supp. 2d at 70–74 (conducting similar analysis). Like the plaintiffs in *Raines*, what Plaintiffs here ask of the court is "contrary to historical experience." *See Raines*, 521 U.S. at 829. First, as a general matter, inter-branch disputes have typically been resolved through the political process. *See Chenoweth*, 181 F.3d at 113–14 ("Historically, political disputes between Members of the Legislative and Executive Branches were resolved without resort to the courts."); *cf. Raines*, 521 U.S. at 826 ("It is evident from several episodes in our history that in analogous confrontations between one or both Houses of Congress and the Executive Branch, no suit was brought on the basis of claimed injury to official authority or power."). Plaintiffs' suit therefore runs against the strong current of history.

Second, when courts have entered the fray to resolve informational disputes between the political branches, they have done so exclusively in the context of subpoena enforcement actions. *See Waxman II*, 2006 WL 8432224, at *16 (noting that such cases merely suggest that "as a matter of historical practice, federal courts have adjudicated informational disputes between the executive and legislative branches only when one of the Houses of Congress has sought their intervention," not that courts "should act when individual Members file suit"); *see, e.g.*, *Holder*, 979 F. Supp. 2d

32

1; *Miers*, 558 F. Supp. 2d 53. As discussed in more detail in the next section, the majority consent required to bring such actions makes those cases materially different than this one.

Third, there is almost no historical precedent for Members of Congress to even *attempt* to enforce unmet Seven Member Rule demands through the federal courts. The parties have identified only two other cases in the 90-year history of section 2954 like this one. *See Waxman v. Evans* ("*Waxman I*"), No. 01-4530, 2002 WL 32377615 (C.D. Cal. Jan. 18, 2002), *rev'd and vacated*, 52 F. App'x 84 (9th Cir. 2002) (vacating ruling in favor of legislator-plaintiffs); *Waxman II*, 2006 WL 8432224, at *6–12 (holding that committee members lacked standing); *see also id.* at *13–14 (noting that, prior to *Waxman I*, only two cases "even mentioned the statute," and that, "if anything," those cases suggested "that [it] has *not* been the practice" for "the executive and legislative branches to resort to the courts when they dispute the proper scope of disclosure under § 2954," because in each case, "FOIA, rather than § 2954, was invoked"). This complete dearth of Seven Member Rule enforcement proceedings over a 90-year period is strong evidence that, historically, the proper solution has been a political and not a judicial one. *See* Hr'g Tr. at 54 (noting that in the past, the political branches have worked out document requests "simply by sitting down and talking," even in "controversial disputes, like Whitewater or the savings [and] loan controversy").

In sum, "[a]n analysis of historical precedent does not turn the standing assessment in [Plaintiffs'] favor by demonstrating a judicially cognizable injury." *Walker*, 230 F. Supp. 2d at 70.

b.     Lack of Authorization

Equally significant is Plaintiffs' lack of authorization to bring this action. At the end of its opinion in *Raines*, the Court noted that it "attach[ed] some importance to the fact that [the

33

plaintiffs] ha[d] not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose[d] their suit." 521 U.S. at 829. Since *Raines*, courts have treated authorization by the whole to bring suit as a significant factor in the standing analysis.

Take *Committee on the Judiciary v. Miers*, for example. In that case, the House Committee on the Judiciary sued to compel senior presidential aides to testify and produce a privilege log in response to a congressional subpoena *after* the House passed a resolution authorizing the committee to seek civil enforcement of its subpoena authority. *See Miers*, 558 F. Supp. 2d at 55–64. There, the court held that the House Judiciary Committee had standing "to enforce its duly issued subpoena through a civil suit." *Id.* at 68. Importantly, the court found that *Raines* did not undermine the D.C. Circuit's decision in *United States v. AT&T*, 551 F.2d 384 (D.C. Cir. 1976), a case in which the chairman of a subcommittee was authorized to intervene on behalf of the House to defend the institution's interest in compliance with a duly issued congressional subpoena. *Miers*, 558 F. Supp. 2d at 68–70; *see also AT&T*, 551 F.2d at 391 ("It is clear that the House as a whole has standing to assert its investigatory power, and can designate a member to act on its behalf."). The *Miers* court reasoned that unlike in *Raines*, where "*individual* Members sought to ameliorate Congress's *institutional* injury without the consent of the institution itself," the chairman in *AT&T* "represented the *institution* and sought to remedy a potential *institutional* injury." *Miers*, 558 F. Supp. 2d at 70. The court also distinguished its prior decision in *Walker*, explaining that "all of the missing factors identified in *Walker* [were] present" in *Miers*, including a congressional subpoena and authorization from the full House for the suit. *Id.* Indeed, "the fact that the House ha[d] issued a subpoena and explicitly authorized th[e] suit" was "the *key factor* that move[d] th[e] case from the impermissible category of an individual plaintiff asserting an institutional injury (*Raines*, *Walker*) to the permissible category of an institutional plaintiff

asserting an institutional injury ([*AT&T*], . . .)." *Id*. at 71 (emphasis added). Other decisions likewise emphasize the importance of authorization to bring suit as a key component of standing. *See Holder*, 979 F. Supp. 2d at 21 ("[T]he House of Representatives has specifically authorized the initiation of this action to enforce the subpoena. Twice. Thus, *Raines* is entirely distinguishable from the situation at hand . . . ."); *cf. Burwell*, 130 F. Supp. 3d at 67 ("But the plaintiff here is the House of Representatives, duly authorized to sue as an institution, not individual members as in *Raines*.").

None of this is meant to suggest that authorization to sue, by itself, is enough to confer standing. *See Raines*, 521 U.S. at 829 (expressly declining to decide whether the plaintiffs would have had standing if they had received authorization); *United States v. Windsor*, 570 U.S. 744, 790–91 (2013) (Scalia, J., dissenting) (rejecting as a basis for standing the notion that "a bare majority of both Houses could bring into court the assertion that the Executive's implementation of welfare programs is too generous—a failure that no other litigant would have standing to complain about"). But there are good reasons for courts to look to the presence of authorization as a necessary, even if not sufficient, factor in evaluating standing in cases that pit the Executive and Legislative Branches against one another.

First, an affirmative vote to sue ensures that "the Judiciary's power [is kept] within its proper constitutional sphere." *Raines*, 521 U.S. at 820. Indeed, the Supreme Court has emphasized that the standing inquiry must be "especially rigorous when reaching the merits of a dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government" is unlawful. *Id.* at 819–20. Insisting on approval from the institution as a whole ensures that only fully considered inter-branch conflicts enter the judicial realm. *See id.* at 820 n.3, 829 (stating that, as a general matter, a legislative enactment granting a particular plaintiff the

35

right to sue "significantly lessens the risk of unwanted conflict with the Legislative Branch when that plaintiff brings suit," but ultimately attaching "some importance" to absence of congressional authorization where plaintiffs were individual Members of Congress). Additionally, requiring authorization protects Congress' institutional concerns from the caprice of a restless minority of Members.[7] As the D.C. Circuit explained in *AT&T*, a resolution by the entire legislative body prevents a "wayward committee [from] acting contrary to the will of the House" and safeguards against "aberrant subcommittee or committee demands." *See* 551 F.2d at 393 & n.16 (citing *Wilson v. United States*, 369 F.2d 198 (1966)). And, as the Supreme Court has observed since *Raines*, where individual Members of Congress "fail[] to prevail in their own Houses" by receiving authorization to file suit, "the suitors [cannot] repair to the Judiciary to complain." *Arizona*, 135 S. Ct. at 2664.

In this case, Plaintiffs did not secure approval from the full House before bringing suit— indeed, they did not even try to. *See* Hr'g Tr. at 33–34. That fact not only carries "some importance" and therefore counsels against recognizing standing, *see Raines*, 521 U.S. at 829, but it also distinguishes this case from *Miers*, *Holder*, and *Burwell*—the *only* cases that have recognized legislative standing to vindicate an institutional injury that does not satisfy the narrow *Coleman* standard. In other words, while there is some authority in this Circuit that supports the proposition that "*a House of Congress or committee of Congress* would have standing to sue to retrieve information to which it is entitled," *Walker*, 230 F. Supp. 2d at 68 (emphasis added) (citing cases); *see supra* (discussing *Miers* and *Holder*)—there is no authority that recognizes an *individual* Member of Congress' right to do the same.

---

[7] The court does not suggest that the Plaintiffs here are so motivated.

36

Recognizing this weakness, Plaintiffs insist that they have been "duly authorized" to bring this suit by virtue of Congress' enactment of section 2954 itself. Pls.' Mem. at 25 n.10. The mere adoption of section 2954 cannot, however, carry the weight that Plaintiffs accord it. It is a dubious proposition that, when Congress adopted the Seven Member Rule 90 years ago, it meant the statute to be an unqualified grant of permission for as few as seven members of the House Oversight Committee to bring suit against the Executive Branch any time those members were dissatisfied with a document production. *See Walker*, 230 F. Supp. 2d at 69–70 (stating that the "highly generalized allocation of enforcement power" given to the Comptroller General "twenty-two years ago hardly gives this Court confidence that the current Congress has authorized this Comptroller General to pursue a judicial resolution of the specific issues affecting the balance of power between the Article I and Article II Branches"). Nothing about the text or history of section 2954 supports such an interpretation.[8] Indeed, Plaintiffs' view, if accepted, would have profound consequences for the balance of powers between the political branches, as it would mean that a small group of congressmen could initiate an inter-branch conflict, even if the institution, speaking through a majority vote, opposes the confrontation. So, the court reads the Seven Member Rule only to allow what it plainly says: A minority group of Members of the House Oversight Committee may make a demand for information from an Executive agency. The Rule says nothing, however, about such a group's capacity to file suit to enforce the demand, let alone whether they could do so without

---

[8] The court also notes that treating section 2954 as a blanket authorization for minority members of the Oversight Committee to sue would seem to conflict with current House Rules regarding the enforcement of a subpoena issued by the Committee itself. *See* Rule XI, cl. 2(m)(1)–(3), Rules of the House of Representatives, https://rules.house.gov/sites/republicans.rules house.gov/files/115/PDF/House-Rules-115.pdf [hereinafter House Rules]. Under those rules, "[c]ompliance with a subpoena issued by a committee . . . may be enforced *only as authorized or directed by the House*." House Rule XI, cl. 2(m)(3)(C) (emphasis added).

the majority assent of their colleagues.[9]  The absence of approval from the House to commence this suit to remedy an institutional injury therefore is fatal to Plaintiffs' assertion of standing.

c.        Alternative Remedies

Finally, the Court in *Raines* buttressed its standing decision by noting that the plaintiffs there were not left without avenues of redress.  They could, the Court observed, endeavor to "repeal the [Line Item Veto Act] or exempt appropriations bills from its reach." *Raines*, 521 U.S. at 829. The Circuit likewise has recognized that the availability of political solutions strongly militates against finding legislative standing to resolve a dispute between the political branches. *Cf. Campbell*, 203 F.3d at 24 (emphasizing *Raines*' general focus on "the political self-help available to congressmen" and noting that *Raines* explicitly rejected argument that "legislators should not be required to turn to politics instead of the courts for their remedy").

Plaintiffs here have political tools available to them, too.  For instance, Plaintiffs could attempt to convince a majority of their colleagues on the House Oversight Committee to join in their demand under section 2954 or, alternatively, to issue a subpoena for the documents, *see* Rule XI, cl. 2(m)(1)–(3), Rules of the House of Representatives, https://rules.house.gov/sites/republicans.rules.house.gov/files/115/PDF/House-Rules-115.pdf [hereinafter House Rules].  Presumably, with majority support from the Oversight Committee, GSA's refusal to produce documents would be met with greater political force.  And, even if their Oversight Committee colleagues rejected their efforts, Plaintiffs could urge the House Bipartisan

---

[9]  Notably, Plaintiffs' assertion that they are "duly authorized" by statute—rather than by House Resolution as in *Miers*, *Holder*, and *Burwell*—conflicts with the Supreme Court's decision in *Raines*. There, the Court observed that the plaintiffs had not been "authorized to represent their respective Houses of Congress," *Raines*, 521 U.S. at 829, even though the Line Item Veto Act contained a general provision granting Congress members the right to challenge the Act's constitutionality.  Thus, even if section 2954 contained a similar provision—which it does not, *see* 5 U.S.C. § 2954; Pls.' Mem. at 3 (conceding that section 2954 itself does not provide a private right of action)—such a provision would not serve as evidence that the current House of Representatives "authorized" Plaintiffs to file suit.

Legal Advisory Group to support litigation to enforce the Seven Member Rule requests.[10] According to Plaintiffs, they did not try this route. *See* Hr'g Tr. at 33–36. And of course there are other political levers at the House's disposal if Plaintiffs were able to convince a majority of their colleagues of the institutional importance of respecting a Seven Member Rule request. *See generally* Fisher, *supra* (listing various means by which Congress can obtain information from the Executive).

Admittedly, had these paths been readily available, Plaintiffs would not have filed this action. But the fact that a political remedy is hard to achieve does not automatically swing open the doors to the federal courts. *See Campbell*, 203 F.3d at 23–24 (broadly construing available options for political redress to even include "the possibility of impeachment should a President act in disregard of Congress' authority").

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs lack standing under Article III to seek judicial enforcement of their requests for information from GSA under 5 U.S.C. § 2954. Accordingly, the court grants Defendant's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1) and denies Plaintiffs' Cross-Motion for Summary Judgment.

A separate order accompanies this Memorandum Opinion.

Dated:  August 14, 2018                                   Amit P. Mehta
                                                                          United States District Judge

---

[10] The Bipartisan Legal Advisory Group consists of the Speaker of the House and the majority and minority leaderships. House Rule II, cl. 8(b). According to House Rules, "[u]less otherwise provided by the House, the Bipartisan Legal Advisory Group speaks for, and articulates the institutional positions of, the House in all litigation matters." *Id.*